```
           IN THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF HAWAII

UNITED STATES OF AMERICA,    )   CR. NO. 13-01014 SOM
                             )
         Plaintiff,          )   ORDER DENYING MOTION FOR
                             )   COMPASSIONATE RELEASE
                             )
                             )
    vs.                      )
                             )
TULITUAFULU TULI MAATA,      )
                             )
         Defendant.          )
                             )
_____)
```

**ORDER DENYING MOTION FOR COMPASSIONATE RELEASE**

**I.      INTRODUCTION.**

On March 31, 2014, this court sentenced Defendant Tulituafulu Tuli Maata to 160 months of imprisonment and five years of supervised release. Maata had entered a guilty plea with respect to two drug crimes--(1) one count of conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, and (2) one count of possession with intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)). *See* ECF Nos. 36 and 37. Maata was responsible for 1.724 kilograms of "ice." *See* Pretrial Investigation Report, ECF No. 38, PageID # 109; ECF No. 36 (adopting Pretrial Investigation Report). On July 13, 2015, the court reduced Maata's sentence of incarceration to 151 months pursuant to Amendment 782 and 18

U.S.C. § 3582(c)(2). *See* ECF No. 39.

Maata is currently incarcerated in the South Satellite Camp of USP Lompoc, in Lompoc, California. He has a projected release date of January 27, 2024. *See* ECF No. 41-1, PageID # 143; ECF No. 44, PageID # 220 (medical record indicating that Maata "is a Camp inmate"); https://www.bop.gov/inmateloc/ (input Register Number 15568-022) (last visited October 21, 2020).

USP Lompoc houses 1,209 inmates, with 896 at the USP, 105 at the North Camp, and 208 at the South Camp. *See* https://www.bop.gov/locations/institutions/lom/ (last visited October 21, 2020). As of the morning of October 21, 2020, USP Lompoc has no active cases of COVID-19 in its inmate population and four active cases of COVID-19 in its staff. USP Lompoc and its two camps have had 149 inmates and 24 staff members recover from COVID-19. Two inmates have died. *See* https://www.bop.gov/coronavirus/index.jsp (last visited October 21, 2020). It is not clear how many of individuals at the South Camp in which Maata is incarcerated have had COVID-19, as the numbers published on the BOP website combine the totals for the USP and its two camps.

Maata's moving papers state that he is 50 years old and 5' 11" and 350 pounds (making him morbidly obese), and that he has hypertension, gout, and vitamin D and B-12 deficiencies. These statements are supported by the sealed medical records

submitted to the court. *See* ECF No. 44, Page ID #s 203, 205, 223, 248; ECF No. 55, PageID # 530; *see also* Presentence Investigation Report, ECF No. 38, PageID # 112. Apparently, Maata had gastric bypass surgery in 2000, when he weighed 378 pounds and had a body mass index of 52.7. *See* ECF No. 52, PageID # 490. Despite this surgery, Maata at this point weighs 350 pounds and has a BMI of 48.8. *See* ECF No. 41, PageID # 133; *see also* ECF No. 44, PageID # 204; https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html. Maata's hypertension appears to be under control given his medical treatment. *See* ECF No. 50-1, PageID #s 354, 357; ECF No. 55, PageID # 532. Although a COVID-19 test has been ordered for Maata, *see* ECF No. 44, Page ID # 210 and ECF No. 50-1, PageID # 366, he says that it has not been performed. *See* ECF No. 52-5, PageID # 519 (e-mail from Maata stating, "No, I have never been tested for CV-19.").

**II.     ANALYSIS.**

Maata's compassionate release request is governed by 18 U.S.C. § 3582(c)(1)(A), which provides:

> [T]he court . . . upon motion of the
> defendant after the defendant has fully
> exhausted all administrative rights to appeal
> a failure of the Bureau of Prisons to bring a
> motion on the defendant's behalf or the lapse
> of 30 days from the receipt of such a request
> by the warden of the defendant's facility,
> whichever is earlier, may reduce the term of
> imprisonment (and may impose a term of

> probation or supervised release with or
> without conditions that does not exceed the
> unserved portion of the original term of
> imprisonment), after considering the factors
> set forth in section 3553(a) to the extent
> that they are applicable, if it finds that--
>
> (i) extraordinary and compelling reasons
> warrant such a reduction . . . .
>
> and that such a reduction is consistent with
> applicable policy statements issued by the
> Sentencing Commission.

In other words, for the court to exercise its authority under § 3582(c)(1)(A), it must (1) find that the defendant exhausted his administrative remedies or that 30 days have passed since he filed an administrative compassionate relief request; (2) also find, after considering the factors set forth in section 3553(a), that extraordinary and compelling reasons warrant a sentence reduction; and (3) find that such a reduction is consistent with the Sentencing Commission's policy statements. *United States v. Scher*, 2020 WL 3086234, at *2 (D. Haw. June 10, 2020).

### A. Maata Has Satisfied the Time-lapse Requirement of 18 U.s.c. § 3582(c)(1)(A).

Maata submitted an administrative compassionate release request to the warden of his prison on June 19, 2020, more than 30 days before filing this motion. *See* ECF No. 41-5, PageID # 177; ECF No. 41. The Government concedes that Maata has satisfied the exhaustion requirement. *See* ECF No. 47, PageID #s 287-88. Accordingly, this court finds that Maata has fulfilled the first requirement of § 3582(c)(1)(A).

B.  **This Court Has Discretion in Determining Whether Extraordinary and Compelling Reasons Justify a Reduced Sentence.**

This court turns to § 3582(c)(1)(A)'s second requirement: whether extraordinary and compelling reasons warrant a sentence reduction. In orders addressing compassionate release motions in other cases, this court has expressly recognized that it possesses considerable discretion in determining whether a particular defendant has established the existence of extraordinary and compelling reasons that justify early release. This court has also stated that, in reading § 3582(c)(1)(A) as providing for considerable judicial discretion, the court is well aware of the absence of an amended policy statement from the Sentencing Commission reflecting the discretion given to courts when Congress amended the statute to allow inmates themselves to file compassionate release motions, which previously only the Bureau of Prisons could file for inmates. *See United States v. Mau*, 2020 WL 6153581 (D. Haw. Oct. 20, 2020); United *States v. Scher,* 2020 WL 3086234, at *2 (D. Haw. June 10, 2020); *United States v. Cisneros*, 2020 WL 3065103, at *2 (D. Haw. Jun. 9, 2020); *United States v. Kamaka*, 2020 WL 2820139, at *3 (D. Haw. May 29, 2020). Specifically, this court has recognized that an Application Note to a relevant sentencing guideline is outdated. This court continues to view its discretion as not limited by

Sentencing Commission pronouncements that are now at odds with the congressional intent behind recent statutory amendments.

As amended by Congress, § 3582(c)(1)(A) states that a court's conclusion that extraordinary and compelling circumstances warrant a reduction in sentence must be consistent with any *applicable* policy statements issued by the Sentencing Commission. But following the First Step Act's amendments to § 3582(c)(1)(A) in 2018, the Sentencing Commission did not adjust its statements to make them consistent with the statutory amendment allowing prisoners themselves to bring motions for compassionate release. Instead, the Sentencing Commission has left in place statements premised on the Bureau of Prisons' exclusive authority to bring compassionate release motions. This court reads such statements as inapplicable to motions brought directly by prisoners. This court's exercise of discretion is consistent with the statutory amendment and at least the spirit of the Sentencing Commission's approach. *Mau*, 2020 WL 6153581; *Kamaka*, 2020 WL 2820139, at *2-3.

This court reads Application Note 1 to section 1B1.13 of the Sentencing Guidelines, which relates to compassionate release motions, as providing that extraordinary and compelling reasons warrant early release under any of four circumstances: if "(1) the defendant suffers from a terminal illness and certain other conditions are met; (2) the defendant suffers from a

physical or mental condition that 'substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover;' (3) certain family circumstances justify compassionate release; or (4) '[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, [the first three categories of reasons].'" *Kamaka*, 2020 WL 2820139, at *2 (quoting U.S.S.G § 1B1.13, Application Note 1). Crucially, the final "catch-all" category applies only to the situation in which the Director of the Bureau of Prisons has made the required determination relating to compassionate release.

That "catch-all" made sense when only the Director of the Bureau of Prisons could bring a compassionate release motion. The Sentencing Commission anticipated that the Director of the Bureau of Prisons, and not the courts, would rely on the four categories:

> A reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons pursuant to 18 U.S.C. § 3582(c)(1)(A). The Commission encourages the Director of the Bureau of Prisons to file such a motion if the defendant [falls under any of the four enumerated categories]. *The court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the factors set forth in 18*

> *U.S.C. § 3553(a) and the criteria set forth in this policy statement, such as the defendant's medical condition, the defendant's family circumstances, and whether the defendant is a danger to the safety of any other person or to the community.*

U.S.S.G § 1B1.13, Application Note 4 (emphasis added). In other words, the Sentencing Commission anticipated that the Director of the Bureau of Prisons would file a compassionate release motion whenever it determined that an inmate fell into one of the four enumerated categories of extraordinary and compelling circumstances. Even then, when a court considered the motion, it was expected to exercise discretion (after considering a broad range of criteria, such as the § 3553 factors, the defendant's medical condition, and the defendant's family circumstances). That is, when the Director of the Bureau of Prisons brought a motion to the court, the Sentencing Commission did not intend for the court to be bound by the four enumerated categories. In particular, the Sentencing Commission did not intend for the court to be bound by the Director of the Bureau of Prisons' determination that "other reasons" justified early release.

If courts were indeed bound by the "catch-all" category, and if that category only allowed the Director of the Bureau of Prisons to exercise discretion, then judicial review would be meaningless. Courts would have to determine that extraordinary and compelling circumstances existed every time the Director of the Bureau of Prisons made such a determination.

8

Courts would be nothing more than a rubber stamp. That was not the vision the Sentencing Commission had even under the old scheme. Instead, in noting that a court was in "a unique position to determine whether the circumstances warrant a reduction," the Sentencing Commission was clearly anticipating that courts would independently review such motions. U.S.S.G § 1B1.13, Application Note 4.

In sum, in Application Note 1, the Sentencing Commission reviewed the four categories that the Director of the Bureau of Prisons, not the courts, could consider in bringing motions. Those categories are not "applicable" to compassionate release motions brought by inmates themselves. *See United States v. Brooker*, --- F.3d ---, 2020 WL 5739712, at *4-6 (2d Cir. Sept. 25, 2020) ("[W]e read the Guideline as surviving, but now applying only to those motions that the BOP has made."). Even if the commentary applies to motions filed by inmates, a court's exercise of discretion to make the determination formerly made by the Director of the Bureau of Prisons is consistent with the Sentencing Commission's understanding of the scope of a court's authority over the ultimate compassionate release decision. *See Mau*, 2020 WL 6153581; *Kamaka*, 2020 WL 2820139, at *2.

In allowing inmate motions, Congress gave no indication that judicial discretion was more constrained with inmate motions than with Bureau of Prisons motions. It appears that Congress

reasonably expected Application Note 1 to be amended or supplemented.  That did not occur.  Possibly that was because the Sentencing Commission was short commissioners and thus lacked a quorum.[1]  As this court has already concluded, the outdated Application Note does not constrain this court's discretion in determining whether extraordinary and compelling circumstances warrant a reduction in a sentence.  *See Mau*, 2020 WL 6153581.  Accordingly, the court rejects the Government's argument that the applicable policy statements limit "extraordinary and compelling reasons" to medical conditions, age, and family circumstances.  *See* ECF No. 47, PageID # 277.

>    **C.   Maata Has Not Demonstrated That Extraordinary and Compelling Circumstances Justify His Early Release**.

According to the CDC, a person's risk of a severe illness (one that may require hospitalization, intensive care, or a ventalator) from COVID-19 increases with age.  The CDC website explains that "people in their 50s are at higher risk for severe illness than people in their 40s.  Similarly, people in their 60s or 70s are, in general, at higher risk for severe illness than

---

[1] It appears that the Sentencing Commission has not had the opportunity to revise the policy statement in response to the First Step Act, because, since the passage of the First Step Act, the Sentencing Commission has had only two voting commissioners. *See, e.g.*, *United States v. Haynes*, 2020 WL 1941478, at *12 n.20 (E.D.N.Y. Apr. 22, 2020). The guidelines cannot be amended until two more voting commissioners are appointed to constitute a quorum.  *Id.*

people in their 50s.  The greatest risk for severe illness from COVID-19 is among those aged 85 or older."
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited October 21, 2020).

        The CDC currently lists the following conditions for people of any age as creating an increased risk of a severe illness from COVID-19:

    *Cancer

    *Chronic kidney disease

    *COPD (chronic obstructive pulmonary disease)

    *heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies

    *Immunocompromised state (weakened immune system) from solid organ transplant

    *Obesity (body mass index [BMI] of 30 kg/m2 or higher but < 40 kg/m2)

    *Severe Obesity (BMI = 40 kg/m2)

    *Sickle cell disease

    *Smoking

    *Type 2 diabetes mellitus

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited October 21, 2020).

        The CDC also lists the following as possibly increasing the risk of a severe illness from COVID-19:

   *Asthma (moderate-to-severe)

   *Cerebrovascular disease (affects blood vessels and blood supply to the brain)

   *Cystic fibrosis

   *Hypertension or high blood pressure

   *Immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines

   *Neurologic conditions, such as dementia

   *Liver disease

   *Overweight (BMI > 25 kg/m2, but < 30 kg/m2)

   *Pregnancy

   *Pulmonary fibrosis (having damaged or scarred lung tissues)

   *Thalassemia (a type of blood disorder)

   *Type 1 diabetes mellitus

*Id.*

   The CDC notes that "[t]he more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." *Id.* Given the CDC's guidance, this court concludes that Maata's morbid obesity and hypertension place him at an increased risk of a severe illness if he contracts COVID-19, although the extent of that risk is unclear. Generally, multiple medical conditions place a defendant at greater risk than defendants whose only medical condition is obesity. *See United States v. Akolo*, 2020 WL 4810104, at *3 (D.

Haw. Aug. 18, 2020) ("While this court certainly agrees that Akolo has legitimate concerns about contracting COVID-19, his obesity, standing alone, is not an exceptional and compelling reason that warrants a reduction in sentence."). However, it is not clear whether a person who has hypertension that is medically controlled, which is Maata's situation, is at a materially increased risk. *See* William F. Marshall, III, M.D., *COVID-19 and High Blood Pressure: Am I at Risk?*, https://www.mayoclinic.org/diseases-conditions/coronavirus/expert-answers/coronavirus-high-blood-pressure/faq-20487663 ("The latest evidence shows that people with uncontrolled or untreated high blood pressure may be at risk of getting severely ill with COVID-19. It's also important to note that people with untreated high blood pressure seem to be more at risk of complications from COVID-19 than those whose high blood pressure is managed with medication."). The court recognizes the possibility that Maata's vitamin D deficiency may place him at risk with respect to COVID-19. *See UChicago Medicine researchers find association between vitamin deficiency, risk of infection*, https://news.uchicago.edu/story/vitamin-d-deficiency-may-raise-risk-getting-covid-19-study-finds (last visited October 21, 2020); David O. Meltzer, *Association of Vitamin DX Deficiency and Treatment with COVID-19*, May 13, 2020, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7274230/ ("Vitamin D

13

deficiency that is not sufficiently treated is associated with COVID-19 risk.") (not subjected to peer review).

Maata's risk of a severe infection from COVID-19 is tempered by the lack of active COVID-19 cases at USP Lompoc. Early in the COVID-19 pandemic, the virus spread rapidly through the prison. USP Lompoc and its two camps have had 149 inmate and 24 staff members recover from COVID-19, but 2 inmates have died. *See* https://www.bop.gov/coronavirus/index.jsp (last visited October 21, 2020). However, as of the morning of October 21, 2020, USP Lompoc has no active inmate cases of COVID-19 and 4 active staff cases of COVID-19. Presumably, the infected staff members are not coming to work. *Id.*

As this court noted in *United States v. Kamaka*, 2020 WL 2820139, at *1 (D. Haw, May 29, 2020), the dormitory setting at the camps at USP Lompoc "invites the further spread of the coronavirus." The communal dormitory setting in the camps, with shared toilets and showers, means that, when "an inmate is infected but has not been identified as such and isolated, other inmates almost certainly will come into contact with him." *Id.* at *4. Accordingly, even though USP Lompoc has no active inmate cases, this court is nevertheless concerned that the camp setting in which Maata is housed increases his risk of contracting COVID-19 should the virus reenter the prison.

Because the parties offered conflicting accounts of the

prison's present conditions, this court deferred ruling on this motion until it could review an expert report by Dr. Homer Venters summarizing the current state of the Lompoc complex COVID-19 outbreak.  The report was submitted in a pending case, *Torres v. Milusnic*, No. CV. 20-4450 CBM (C.D. Cal.).  Venters filed his report on September 25, 2020, *see* ECF No. 57-1 (copy of report filed in this case), calling the COVID-19 outbreak at the Lompoc complex "one of the nation's most overwhelming."  *Id.*, PageID # 573.

Venters indicates that "most of the workers for the farm, transportation, safety, food service and Air Force base were housed in the Camps," where Maata is incarcerated.  *Id.*, PageID # 581.  As pointed out in Maata's Supplemental Memorandum, ECF Nop. 603, what Venters was told by BOP staff sometimes differed greatly from what he was told by inmates at the South Camp.  For example, according to staff, the inmate workers from the camps are screened daily for COVID-19 symptoms before starting work.  *Id.*, PageID # 581-82.  However, no inmate "reported ever having been screened as part of their work detail."  *Id.*, PageID # 584.

With respect to the South Camp medical facilities, staff told Venters that medical staff spent whatever time was necessary to see patients and that the "sick call response time" was "within 24 hours."  *Id.*, PageID # 583.  But the inmates

Venters spoke with disagreed with that statement, saying that "sick call requests take more than a week for response," and that sometimes it took more than two weeks for a response to injuries. *Id.*

Venters said that inmates in the camps initially had difficulty accessing medical care when they contracted COVID-19. *Id.*, PageID # 584.  He noted that inmates were reluctant to report COVID-19 symptoms because they would then be transferred to a unit operating like solitary confinement.  *Id.*

Most concerning to the court are the inmates' statements that correctional officers regularly refrained from wearing masks and threatened inmates with respect to what they might say to Venters.  *Id.*

While Venters saw that paper towels and soap were available to inmates, inmates told Venters that paper towels and soap only became available right before his visit.  *Id.*

Venters did note some positive things the Lompoc complex was doing to address the risks of COVID-19.  For example, the facility was screening staff well and had a good hospital unit and screening database.  *Id.*, PageID # 590.

Reading the Venters report as a whole, and considering the lack of any active cases of COVID-19 in USP Lompoc and its two camps, the court concludes that Maata is not in immediate danger of being infected with COVID-19, although the possibility

16

that he will be exposed to the virus in the future cannot be ignored.  This court is not discounting what may have been an attempt by the BOP to show Venters better conditions at the prison than usually exist or what may be serious flaws in USP Lompoc's COVID-19 protocols.  Nevertheless, Maata has not shown that his susceptibility to COVID-19, standing alone, is an exceptional and compelling reason that warrants a reduction of his sentence at this time.

        The court therefore turns to an examination of factors set forth in § 3553(a).  Over and above Maata's medical conditions and the situation at his Lompoc camp, several factors favor release: 1) Maata's crime was a nonviolent drug crime; 2) Maata has no history of violence and only one previous conviction for driving under the influence, *see* Presentence Investigation Report, ECF No. 38, PageID # 110; 3) Maata has a history of gainful employment, having worked for an airlines from 1999 through 2013, *id.*, PageID # 113; 4) Maata appears to be a high school graduate, *id.*, PageID # 105 (indicates pending verification); and 5) although sporadic, Maata made attempts in prison to rehabilitate himself by taking numerous educational programs, including one relating to HVACs, *see* ECF No. 41-9, PageID # 189.  If released, Maata hopes to find employment in the HVAC field, putting vocational skills learned in prison to use.  *See* ECF No. 41-1, PageID #s 168-69.  Finally, if released, Maata

has a place to stay. He plans to stay with his sister and her husband, who are both pastors. They live in a three-bedroom house in Texas. Maata indicates that he is willing to abide by any monitoring or other condition. *See* ECF No. 41-1, PageID #s 168-69. While the Government claims Maata is proposing to increase his potential exposure to COVID-19 because the pastors may be seeing members of their congregation, the record does not include details of how the pastors conduct their jobs. Moreover, living far away from where he committed the crimes in this case might help keep Maata on the right track.

On the other hand, there are several factors suggesting that early release should be denied. Maata has had disciplinary sanctions while in prison. On March 13, 2020, for example, Maata was sanctioned for having unidentified contraband. He was also sanctioned for tattooing several years ago (noting that a hearing was held on January 9, 2017, for an incident on December 20, 2016). *See* ECF No. 47-2, PageID # 308. The amount of time remaining on Maata's sentence is also an important consideration. This court's lengthy sentence reflected the extensive nature of the drug crime at issue, which involved multiple pounds "ice." It appears that Maata has been in custody since April 10, 2013, meaning that he has served about seven and a half years of his sentence. *See* Presentence Investigation Report, ECF No. 38, PageID # 123. While the court recognizes that Maata has served a

significant amount of his sentence, he has more than three years left to serve before his projected release date, which takes into account good-time credit.

Like many of the other compassionate release requests this court has received during the COVID-19 pandemic, this is a difficult case. But under § 3582(c)(1)(A), only extraordinary and compelling reasons can justify a reduction in an inmate's sentence. After considering Maata's medical conditions, as well as the apparent improvement in the situation at USP Lompoc, the time remaining on his sentence for the significant drug crimes he was convicted of, his criminal history and lack of violence, his attempts at rehabilitation, his disciplinary sanctions, and his release plan, this court concludes that it lacks an extraordinary and compelling reason to reduce his sentence under § 3582(c)(1)(A). Maata may, of course, file another motion should his factual situation change.

### III.      CONCLUSION.

Maata's request for compassionate release under 18 U.S.C. § 3582(c)(1)(A) is denied.

It is so ordered.

DATED: Honolulu, Hawaii, October 21, 2020.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

*United States v. Maata*, Cr. No. 13-01014 SOM; ORDER DENYING MOTION FOR COMPASSIONATE RELEASE